AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT

1/30/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____VAV_____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

January 30, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ch____ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Robert Anthony Bustamante<br>and Joseph Robert Miera,<br><br>Defendant(s) | Case No.  2:23-mj-00425-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 10, 2023, in the county of Los Angeles in the Central District of California, the

defendants violated:

| Code Sections | Offense Descriptions |
|---|---|
| 18 U.S.C. § 1708 | Mail Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.



_____
*Complainant's signature*

Hiam Achour, United States Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        January 30, 2023
_____

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Paul Abrams, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Rajesh R. Srinivasan

## **AFFIDAVIT**

I, Hiam Achour, being duly sworn, declare and state as follows:

### I.   **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrants for Joseph Robert Miera ("MIERA") and Robert Anthony Bustamante ("BUSTAMANTE"), for a violation of 18 U.S.C. § 1708 (Mail Theft).

2.    This affidavit is also made in support of an application for a warrant to search the following five digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service, in Hermosa Beach, California, as described more fully in Attachment A:

       a.    A black Samsung Cellphone with black case, a sticker with a blue cat and red heart ("SUBJECT DEVICE 1");

       b.    A black Samsung Cellphone with clear case, "As seen On TikTok" phone grip, "94 BY MONTANA COLORS" sticker, screen lock featuring two children ("SUBJECT DEVICE 2");

       c.    A black Apple iPhone with a clear case seized during arrest of MIERA, BUSTAMANTE, and Robert Manuel Gamboa ("SUBJECT DEVICE 3").

       d.    A black WIKO Android Cellphone with no case ("SUBJECT DEVICE 4"); and

       e.    A silver Dell XPS Laptop with EX number 14719297431 ("SUBJECT DEVICE 5").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1704 (Unlawful Possession of Postal Key), 1708 (Mail

Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028
(Fraud and Related Activity in Connection with Identification
Documents, Authentication Features, and Information), 1029
(Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated
Identity Theft) (collectively, the "Subject Offenses"), as
described more fully in Attachment B.  Attachments A and B are
incorporated herein by reference for the items to be seized
described in Attachment B.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
arrest warrant and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.   <u>BACKGROUND OF AFFIANT</u>

5.    I am a United States Postal Inspector with the United
States Postal Inspection Service ("USPIS") and have been so
employed since January 2022.  As part of my training as a United
States Postal Inspector, I attended a sixteen-week training
course in Potomac, Maryland, which included training in the
investigation of mail theft.

6.    I am presently assigned to the Los Angeles Division,
Long Beach Mail Theft Team, which investigates crimes against

the United States Postal Service ("USPS") and crimes related to the misuse of and attacks on the mail system, including theft of United States mail ("US Mail"), possession of stolen US mail, fraud and related activity in connection with access devices (including credit and debit cards), robberies, burglaries, and identity theft.  As part of the Mail Theft team, I have worked closely with, and learned from, other Postal Inspectors on investigations of crimes in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of other persons' information for financial gain, as these criminal schemes have been known to be perpetrated through the US Mail.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On January 10, 2023, at approximately 3:03 a.m., Hermosa Beach Police Department ("HBPD") Officers arrested MIERA, BUSTAMANTE, and Robert Manuel Gamboa for possession of stolen US Mail and possession of a genuine Arrow key.  Officers searched the car that MIERA, BUSTAMANTE, and Gamboa were driving in and found US Mail addressed to people living at 160 Ardmore Avenue, 162 Ardmore Avenue, 164 Ardmore Avenue, 168 Ardmore Avenue, as well as an Arrow key that unlocked the Neighborhood Delivery Cluster Box Unit -- a single unit centralized delivery mailbox with individual compartment and locks for several residences -- located at 166 Ardmore Avenue in Hermosa Beach, California.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my review of law enforcement reports and a search-warrant affidavit, as well as my conversations with other law enforcement officers, I am aware of the following:

**A.   Local Residents Identify MIERA and BUSTAMENTE as Stealing Mail from Their Building**

9.   Based on my review of a report written by HBPD Officer Fabian Reyes and conversations with HBPD Detective Dalton Blumenfeld, I learned the following information:

a.   On January 10, 2023, at approximately 2:57 a.m., D.P., a civilian witness, called 911 to report that people were stealing mail from a community mailbox at 166 Ardmore Avenue in Hermosa Beach, California.  D.P. described the suspects as either two or three Hispanic adults wearing all black clothing. D.P. told the 911 operator that the suspects drove away southbound in a white Tesla sports utility vehicle ("SUV") without license plates.

b.   HBPD's dispatcher communicated this information to HBPD Officers Matthew Franco, Fabian Reyes, and Keaton Dadigan and dispatched them to 166 Ardmore Avenue.  Officer Reyes and Franco were in one patrol car and Officer Dadigan was in a separate patrol car.

10.   Based on my review of reports written by Officer Reyes and Officer Dadigan and conversations with Officer Dadigan and Detective Blumenfeld, I learned that at approximately 3:02 a.m., Officer Dadigan located a white Tesla Model Y SUV with temporary license plates pulling northbound onto East Pacific Coast

Highway from North Guadalupe Avenue.  Based on my review of a
Google map, I understand that this location is approximately 0.5
miles away from 166 Ardmore Avenue.  Officer Dadigan told
Officers Franco and Reyes that a car matching the witness's
description was driving northbound on Pacific Coast Highway and
followed the car.

11.  Based on my review of reports written by Officer Reyes
and Officer Dadigan, as well as conversations with Officer
Dadigan, I learned that at approximately 3:03 a.m., on the 200
block of East Pacific Coast Highway in Hermosa Beach, Officer
Dadigan conducted a traffic stop of the Tesla.  After Officers
Franco and Reyes arrived at the location, the officers removed
three occupants from the car.  The officers obtained
identification from each occupant and asked for their names.
The officers identified the driver -- a Hispanic male adult
wearing a black hooded sweatshirt, blue jeans, and black shoes -
-- as Gamboa.  The officers identified the front passenger -- a
Hispanic male adult wearing a black jacket, black pants, and
black shoes -- as BUSTAMANTE.  The officers identified the rear
passenger -- a Hispanic male adult wearing a black hooded
sweatshirt and blue pants -- as MIERA.  The officers detained
all three occupants.

12.  Based on my review of a report written by Officer
Dadigan, I learned the following information:

a.  While the subjects were detained, Officer Dadigan
drove to 166 Ardmore Avenue. Officers Dadigan spoke with D.P.,
who had called 911.  Officer Dadigan then brought D.P. to where

Gamboa, MIERA, and BUSTAMANTE were detained.  D.P. recognized MIERA and BUSTAMANTE as two people who were stealing mail, but he was unable to identify Gamboa as one of the suspects involved in the mail theft.

      b.   Next, Officer Dadigan spoke to another witness, J.C.  Officer Dadigan brought J.C. to where Gamboa, MIERA, and BUSTAMANTE were detained.  J.C. also recognized MIERA and BUSTAMANTE as two people who were stealing mail, but he was unable to identify Gamboa as one of the suspects involved in the mail theft.

      c.   Officer Dadigan interviewed J.C.  J.C. said that he was inside 163 Ardmore Avenue, and through the front window, he saw people breaking into mail boxes.  J.C. saw a white Tesla parked on the street with one person inside of it, and he saw two people at the mailbox.  He saw the two people at the mailbox open the mailbox and stuff a white bag with mail.

      d.   Officer Dadigan then interviewed D.P.  D.P. told Officer Dadigan that he witnessed two males exit a white Tesla in front of his apartment, and he saw one of them open the mailbox.  D.P. saw the suspects put mail in a white bag, re-enter the vehicle, and drive southbound.

**B.   Cell Phones Are Recovered from the White Tesla Model Y Search Along with a Stolen Arrow Key/U.S. Mail**

13.  Based on my review of a report written by Officer Reyes and conversations with Detective Blumenfeld, I learned the following information:

a.   After Gamboa, MIERA, and BUSTAMANTE were detained, Officer Reyes searched the Tesla.  In plain view, on the front passenger floorboard of the car, Officer Reyes saw an Arrow key attached to a red lanyard.  Officer Franco also found a black backpack on the rear driver side floorboard.  Inside the backpack, Officer Franco found a white pillowcase with 48 pieces of mail addressed to eight different people at the following addresses in Hermosa Beach: 168 Ardmore Avenue, 164 Ardmore Avenue, 162 Ardmore Avenue, and 160 Ardmore Avenue.

b.   Officer Reyes also recovered the following digital devices from the car and arrestees: a Black Samsung Cellphone with black case, a sticker with a blue cat and red heart (SUBJECT DEVICE 1); a Black Samsung Cellphone with clear case, with an "As seen On TikTok" phone grip, "94 BY MONTANA COLORS" sticker, and a screen lock featuring two children (SUBJECT DEVICE 2); and a Black Apple iPhone with a clear case (SUBJECT DEVICE 3).

14.  On January 10, 2023, HBPD Detective Blumenfeld obtained a search warrant for the Tesla in Los Angeles Superior Court.  Based on my review of the search warrant, I learned that during the search of the white Tesla, officers also found Best Western key cards for room number 302.

**C.   Interview of BUSTAMANTE**

15.  According to Detective Blumenfeld's report, on January 10, 2023, at approximately 6:55 a.m., Detective Blumenfeld interviewed BUSTAMANTE at an HBPD interrogation room.  Before questioning BUSTAMANTE, Detective Blumenfeld read BUSTAMANTE his

Miranda rights.  BUSTAMANTE verbally stated that he understood and provided his signature on a form indicating that he understood his rights and that he consented the interview.

16.  During the interview, BUSTAMANTE explained that he, MIERA, and Gamboa are friends and talk on a regular basis.  In the early morning hours on January 10, 2023, Gamboa picked up BUSTAMANTE and MIERA in a Tesla and drove to Hermosa Beach from the San Bernardino area.  They arrived in Hermosa Beach around 1:00 a.m. or 2:00 a.m.  BUSTAMANTE said that he was struggling financially and needed extra cash, and he admitted to stealing mail.  BUSTAMANTE said that all he did was throw mail in the bag and that he did not touch any keys or locks and that he did not know who did.

**D.  White Tesla Model Y Video Recording**

17.  I am also aware from Detective Blumenfeld's search warrant application, his reports, and my conversation with him that on January 10, 2023, Detective Blumenfeld contacted the Tesla's registered owner, M.M.  M.M. told Detective Blumenfeld that Gamboa had rented the vehicle from him via an app called Turo within the prior 36 hours.  Detective Blumenfeld is familiar with Tesla vehicles and knows that they have video recording capabilities from the exterior of the vehicle.  Detective Blumenfeld obtained consent from M.M. to search the vehicle's recording system.

18.  During a search of the recordings, Detective Blumenfeld located a recording of the vehicle driving through Hermosa Beach and arriving at 166 Ardmore Avenue.  The video

shows BUSTAMANTE and MIERA exit the car, approach a mailbox, open the mailbox using what appears to be a key, and remove mail from the mailbox.  BUSTAMENTE and MIERA then return to the car, and the car drives away.  In the video, BUSTAMANTE appears to have a lanyard with keys attached to it.  The lanyard and keys appear identical to those recovered from the Tesla.

19.  In another recording, Detective Blumenfeld observed Gamboa, BUSTAMANTE, and MIERA in a hotel parking lot getting into the Tesla.

**E.   Best Western Hotel Room 302 Search Warrant**

20.  On January 10, 2023, Detective Blumenfeld also applied for a search warrant in Los Angeles Superior Court for Room 302 of a Best Western Hotel located on Artesia Boulevard in Redondo Beach, California, which I have reviewed.

21.  According to the search warrant, Detective Blumenfeld first confirmed with the hotel manager that Gamboa was the registered name to room number 302.  The manager also gave Detective Blumenfeld the hotel registration form with Gamboa's information.

22.  After obtaining the search warrant on the same day, Detective Blumenfeld and HBPD Detective Sergeant Eric Cahalan, Detective Garrett McDermott, and Detective Brent Zuber searched the room.  During the search, they recovered from a bedside table a First Hawaiian Bank priority award Mastercard in the name of J.C., a First Hawaiian Bank priority award Mastercard in the name of Robert BUSTAMANTE, a Bank of America Visa card in the name of V.M. and M.Y.R., a clear glass pipe with bulbous

end, and 8.9 grams of a crystalline substance.  Officers found
in a duffel bag a silver DELL XPS laptop (SUBJECT DEVICE 5), MSR
pro card reader used to copy card information, a Navy Federal
Credit Union Visa card in the name of M.Y.R., and three blank
Chase bank checks in the name of T.B. and A.B. bearing the
address 168 Ardmore Avenue, which was next door to where the
mail theft had been reported earlier.  Officers also found a
black WIKO Android cellphone in the room (SUBJECT DEVICE 4).

   23.  Detective Sergeant Cahalan conducted a follow-up
investigation on the two First Hawaiian Bank priority award
Mastercards recovered from the hotel room.  He learned that the
card that was embossed with the name of Robert BUSTAMANTE had a
different name, J.C., encoded on its magnetic strip.  The other
card, which was embossed with the name J.C., was also encoded
with the name J.C. on its magnetic strip.  I know from my
training and experience that suspects involved in identity theft
will often make counterfeit cards by embossing their own name on
another person's card so that they can more easily use the card
to fraudulently obtain money or buy goods.

   **F.   Arrow Key Validation**

   24.  Based on my review of a report written by Detective
Blumenfeld and my review of a video recorded by Detective
Blumenfeld, on January 13, 2023, HBPD Detective Sergeant Cahalan
used the Arrow key that officers recovered from the white Tesla
to successfully unlock the Neighborhood Delivery Cluster Box
Unit located at 166 Ardmore Avenue.

### V.   TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

25.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.   People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal

information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

c.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email

addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

     i.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BUSTAMANTE's, MIERA's, or Gamboa's thumb and/or fingers on the devices; and (2) hold the devices in front of BUSTAMANTE's, MIERA's, or Gamboa's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

     30.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

31.  For all the reasons described above, there is probable cause to believe that MIERA and BUSTAMANTE violated 18 U.S.C. § 1708 (Mail Theft).  There is also probable cause that the

//

//

items to be seized described in Attachment B will be found in a

search of the SUBJECT DEVICES described in Attachment A .


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of
January 2023.

_____
UNITED STATES MAGISTRATE JUDGE
     HON. PAUL L. ABRAMS

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), which were seized on January 10, 2023, and are currently maintained in the custody of the United States Postal Inspection Service:

1.     A black Samsung Cellphone with black case, a sticker with a blue cat and red heart ("SUBJECT DEVICE 1");

2.     A black Samsung Cellphone with clear case, "As seen On TikTok" phone grip, "94 BY MONTANA COLORS" sticker, screen lock featuring two children ("SUBJECT DEVICE 2");

3.     A black Apple iPhone with clear case seized during arrest of MIERA, BUSTAMANTE, and Robert Manuel Gamboa ("SUBJECT DEVICE 3").

4.     A black WIKO Android Cellphone with no case ("SUBJECT DEVICE 4"); and

5.     A silver Dell XPS Laptop with EX number 14719297431 ("SUBJECT DEVICE 5").

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1704 (Unlawful Possession of Postal Key), 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (the "Subject Offenses"), namely:

a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than BUSTAMANTE, MIERA, or Gamboa, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.   Records and programs referring or relating to buying, selling, or transferring financial account information, such as credit card numbers, expiration dates, Card Verification Values (CVVs), and related information;

d.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

e.   Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

f.   Records and programs relating to the counterfeiting or manipulation of credit cards, documents, and identifications, such as the cutting-and-pasting of signatures, letterheads, identification photographs, watermarks, seals, card designs, and re-embossing or re-encoding cards, including the altered or counterfeited information itself;

g.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

h.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

i.   Records and programs relating the movement of wealth such as crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders or Western Union transfers, brokerage and financial institution statements, wire transfers, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, the purchase, sale, or renting of automobiles or real estate, or showing or referring to purchases or transactions for more than $500;

j.    Documents and records referring or relating to law enforcement or bank or creditor investigations, accounts being closed or at risk of being closed, currency transaction reports, and manipulating transactions to avoid scrutiny such as by structuring cash transactions or creating documentation to satisfy anti-money laundering programs;

k.    Contents of any calendar or date book stored on any of the digital devices;

l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

m.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

n.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

o.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

p.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

q.    Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

r.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

a.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

     iii. evidence of the attachment of other devices;

     iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

     v.  evidence of the times the device was used;

     vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

     vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

     viii.   records of or information about
Internet Protocol addresses used by the device;

     ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

  4. The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

  5. During the execution of this search warrant, law
enforcement is permitted to (1) depress MIERA's, BUSTAMANTE's,
and/or Gamboa's thumb- and/or fingers onto the fingerprint
sensor of the SUBJECT DEVICES (only if the device has such a

sensor), and direct which specific finger( and/or thumbs shall be depressed; and (2) hold the device in front of depress MIERA's, BUSTAMANTE's, and/or Gamboa's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.